**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
　　　lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SIMIN KARIMIAN, Individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| v. | JURY TRIAL DEMANDED |
| ALKERMES PUBLIC LIMITED COMPANY, RICHARD F. POPS, and JAMES M. FRATES, | CLASS ACTION |
| Defendants. | |

Plaintiff Simin Karimian ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Alkermes Public Limited Company ("Alkermes" or the "Company"), analysts' reports and advisories about the Company,

1

and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of Alkermes from February 17, 2017 through November 1, 2018, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4.      Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the Company conducts business within this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

7.      Defendant Alkermes is incorporated in Ireland and is a biopharmaceutical company which researches, develops and commercializes pharmaceutical products. The Company's securities are traded on the Nasdaq Stock Market ("NASDAQ") under the ticker symbol "ALKS."

8.      Defendant Richard F. Pops ("Pops") has been the Company's Chairman and Chief Executive Officer ("CEO") throughout the Class Period.

9.      Defendant James M. Frates ("Frates") has been the Company's Senior Vice President and Chief Financial Officer ("CFO") throughout the Class Period.

10.     Defendants Pops and Frates are sometimes referred to herein as the "Individual Defendants."

11.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

12.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

13.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

14.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## **SUBSTANTIVE ALLEGATIONS**

### **Materially False and Misleading Statements**

15.     On February 17, 2017, Alkermes filed a Form 10-K for the fiscal year ended December 31, 2016 with the SEC (the "2016 10-K"), which provided the Company's year-end financial results and position. The 2016 10-K was signed by Defendants Pops and Frates. The 2016 10-K also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Pops and Frates attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

16.     The 2016 10-K stated that Alkermes met with the FDA in February 2017 prior to

its New Drug Application ("NDA") submission for ALKS 5461, stating in relevant part:

> **ALKS 5461**
>
> ALKS 5461 is a proprietary, once-daily, oral sublingual investigational medicine, with a novel mechanism of action, in development for the adjunctive treatment of Major Depressive Disorder ("MDD") in patients with an inadequate response to standard antidepressant therapies. ALKS 5461 is composed of samidorphan in combination with buprenorphine. Samidorphan is a proprietary oral opioid modulator characterized by limited hepatic metabolism and durable pharmacologic activity in modulating brain opioid receptors. In October 2013, the FDA granted Fast Track status for ALKS 5461 for the adjunctive treatment of MDD in patients with inadequate response to standard antidepressant therapies.
>
> *                *                *
>
> ***Based on the results of FORWARD-5, the supportive evidence from FORWARD-4 and the successful phase 2 study of ALKS 5461, we recently met with the FDA's Division of Psychiatric Products at a Type C meeting to discuss ALKS 5461. We will request a pre-NDA meeting with the FDA and plan to submit the New Drug Application ("NDA") for ALKS 5461 in the second half of 2017.***
>
> (Emphasis added.)

17.     On July 27, 2017, Alkermes announced its 2Q 2017 financial results, stating that

it recently had a pre-NDA meeting with the FDA for ALKS 5461 and was on track to complete

the submission of the NDA by year-end, stating in relevant part:

> "We are executing on our strategy and making rapid progress as we continue to invest in our future growth drivers. ***Following a pre-NDA meeting with FDA for ALKS 5461 earlier this week, we are on track to begin the rolling submission of the ALKS 5461 New Drug Application next month and expect to complete the submission by year-end 2017.*** We are excited to bring this important, potential, new proprietary medicine to patients struggling with major depressive disorder," said Richard Pops, Chief Executive Officer of Alkermes. "Alkermes is grounded in our deep commitment to the treatment of addiction and serious mental illness. We continue to advance our pipeline of late-stage product candidates and were also pleased to report positive preliminary topline data from the ALKS 3831 phase 3 antipsychotic efficacy study as well as the approval and launch of the ARISTADA two-month dose in June."

(Emphasis added.)

18.    On January 31, 2018, the Company announced that it had submitted an NDA for

ALKS 5461 for the treatment of major depressive disorder, stating in relevant part:

> DUBLIN, Jan. 31, 2018 /PRNewswire/ -- Alkermes plc (NASDAQ: ALKS) today
> announced that it has submitted a New Drug Application (NDA) to the U.S. Food
> and Drug Administration (FDA) for ALKS 5461, a once-daily, oral
> investigational medicine with a novel mechanism of action for the adjunctive
> treatment of major depressive disorder (MDD). ***The NDA submission is based on
> a comprehensive clinical efficacy and safety package with data from more than
> 30 clinical trials and more than 1,500 patients with MDD. Throughout the
> clinical development program, ALKS 5461 demonstrated a consistent profile of
> antidepressant activity, safety and tolerability in the adjunctive treatment of
> MDD. ALKS 5461 was granted Fast Track status by the FDA in October
> 2013 for the adjunctive treatment of MDD in patients with an inadequate
> response to standard antidepressant therapies.***
>
> "ALKS 5461 represents the first potential treatment option with a novel
> mechanism of action for the treatment of depression in 30 years. We believe its
> unique pharmacology may provide distinct clinical benefits for the large number
> of patients who do not get adequate relief from first-line standard antidepressant
> therapy," stated Elliot Ehrich, M.D., Executive Vice President, Research and
> Development at Alkermes. "With this regulatory submission, we are one step
> closer to our goal of bringing this important new medicine to patients, families
> and healthcare professionals, who are eager for new treatment options."
>
> ***"ALKS 5461 has demonstrated consistent safety, tolerability and antidepressant
> activity for the adjunctive treatment of major depressive disorder throughout its
> comprehensive clinical development program," stated Craig Hopkinson, M.D.,
> Chief Medical Officer and Senior Vice President, Clinical Development and
> Medical Affairs at Alkermes. "The NDA submission of ALKS 5461 further
> demonstrates our ongoing commitment to developing innovative, patient-
> centered treatment options for those afflicted by serious mental illness and
> chronic CNS disorders."***

(Emphasis added.)

19.    On February 16, 2018, Alkermes filed a Form 10-K for the fiscal year ended

December 31, 2017 with the SEC (the "2017 10-K"), which provided the Company's year-end

financial results and position. The 2017 10-K was signed by Defendants Pops and Frates. The

2017 10-K also contained signed SOX certifications by Defendants Pops and Frates attesting to

the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

20.     The 2017 10-K stated that Alkermes met with the FDA prior to its NDA submission for ALKS 5461, and that the NDA was "based on a comprehensive clinical efficacy and safety package with data from more than 30 clinical trials and more than 1,500 patients with [major depressive disorder]." The 2017 10-K stated, in relevant part:

> ***In February 2017 and July 2017, based on the results of FORWARD-5, the supportive evidence from FORWARD-4 and the successful phase 2 study of ALKS 5461 we met with the FDA's Division of Psychiatric Products at a Type C meeting and a pre-NDA meeting, respectively, to discuss ALKS 5461.*** In January 2018, we completed submission of our NDA for ALKS 5461. ***The NDA is based on a comprehensive clinical efficacy and safety package with data from more than 30 clinical trials and more than 1,500 patients with MDD.***

(Emphasis added.)

21.     On April 26, 2018, the Company filed a Form 10-Q for the quarter ended March 31, 2018 with the SEC (the "2018 Q1 10-Q"), which provided the Company's financial results and position. The 2018 Q1 10-Q was signed by Defendants Pops and Frates. The 2018 Q1 10-Q also contained signed SOX certifications by Defendants Pops and Frates attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

22.     The 2018 Q1 10-Q stated its NDA for ALKS 5461 was on track after the FDA issued a refusal to file letter in March 2018, stating in relevant part:

> ***ALKS 5461***
>
> ALKS 5461 is a proprietary, investigational, once-daily, oral medicine that acts as an opioid system modulator and represents a novel mechanism of action for the adjunctive treatment of MDD. ALKS 5461 is a fixed-dose combination of buprenorphine, a partial mu-opioid receptor agonist and kappa-opioid receptor antagonist, and samidorphan, a mu-opioid receptor antagonist. In January 2018, we completed submission of our NDA for ALKS 5461. ***The NDA is based on a***

*clinical efficacy and safety package with data from more than 30 clinical trials and more than 1,500 patients with MDD.*

In March 2018, the FDA issued a refusal to file letter, or RTF, for our ALKS 5461 NDA.  The RTF cited insufficient evidence of effectiveness and the need for additional bridging data between ALKS 5461 and the reference listed drug, buprenorphine.

*In April 2018, two weeks after issuing the RTF and after engaging with us, the FDA rescinded the RTF and accepted the NDA for ALKS 5461 for review. The issues noted in the RTF will be addressed within the context of the FDA's review.* The FDA has issued a target action date for the ALKS 5461 NDA of January 31, 2019 under the Prescription Drug User Fee Act.

(Emphasis added.)

23.     On July 26, 2018, the Company filed a Form 10-Q for the quarter ended June 30, 2018 with the SEC (the "2018 Q2 10-Q"), which provided the Company's financial results and position. The 2018 Q2 10-Q was signed by Defendants Pops and Frates. The 2018 Q2 10-Q also contained signed SOX certifications by Defendants Pops and Frates attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

24.     The 2018 Q2 10-Q provided an update regarding the Company's NDA for ALKS 5461, stating in relevant part:

*ALKS 5461*

ALKS 5461 is a proprietary, investigational, once-daily, oral medicine that acts as an opioid system modulator and represents a novel mechanism of action for the adjunctive treatment of Major Depressive Disorder ("MDD"). ALKS 5461 is a fixed-dose combination of buprenorphine, a partial mu-opioid receptor agonist and kappa-opioid receptor antagonist, and samidorphan, a mu-opioid receptor antagonist. *Our NDA for ALKS 5461 was submitted to the FDA in January 2018 and accepted by the FDA for review in April 2018. Acceptance of the NDA for review followed FDA issuance, and then rescission, of a refusal to file letter citing insufficient evidence of effectiveness and the need for additional bridging data, both of which we expect will be addressed in the context of the FDA's review. The NDA is based on a clinical efficacy and safety package with data from more than 30 clinical trials and more than 1,500 patients with MDD.* The FDA has tentatively scheduled an advisory committee

meeting for the ALKS 5461 NDA on November 1, 2018 and has issued a target action date for the ALKS 5461 NDA of January 31, 2019 under the Prescription Drug User Fee Act.

(Emphasis added.)

25.    On October 23, 2018, the Company filed a Form 10-Q for the quarter ended September 30, 2018 with the SEC (the "2018 Q3 10-Q"), which provided the Company's financial results and position. The 2018 Q3 10-Q was signed by Defendants Pops and Frates. The 2018 Q3 10-Q also contained signed SOX certifications by Defendants Pops and Frates attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

26.    The 2018 Q3 10-Q provided an update regarding the Company's NDA for ALKS 5461, stating in relevant part:

> **ALKS 5461**
>
> ALKS 5461 is a proprietary, investigational, once-daily, oral medicine that acts as an opioid system modulator and represents a novel mechanism of action for the adjunctive treatment of Major Depressive Disorder ("MDD"). ALKS 5461 is a fixed-dose combination of buprenorphine, a partial mu-opioid receptor agonist and kappa-opioid receptor antagonist, and samidorphan, a mu-opioid receptor antagonist. ***Our NDA for ALKS 5461 was submitted to the FDA in January 2018 and accepted by the FDA for review in April 2018. Acceptance of the NDA for review followed FDA issuance, and then rescission, of a refusal to file letter citing insufficient evidence of effectiveness and the need for additional bridging data, both of which we expect we will need to address in the context of the FDA's review. The NDA is based on a clinical efficacy and safety package with data from more than 30 clinical trials and more than 1,500 patients with MDD.*** The FDA has scheduled an advisory committee meeting for the ALKS 5461 NDA on November 1, 2018 and has issued a target action date for the ALKS 5461 NDA of January 31, 2019 under the Prescription Drug User Fee Act ("PDUFA").

(Emphasis added.)

27.    The statements referenced in ¶¶15-26 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts

pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the FDA had advised Alkermes to follow a certain protocol in connection with its NDA submission for ALKS 5461; (2) Alkermes had failed to follow that protocol; (3) consequently, an FDA advisory committee voted 21 to 2 against the approval of ALKS 5461; and (4) as a result, Alkermes' public statements were materially false and/or misleading at all relevant times.

### The Truth Begins to Emerge

28.     On April 2, 2018, Alkermes reported that it received a Refusal to File letter from the FDA regarding its NDA for ALKS 5461. The Company stated that "the FDA has taken the position that it is unable to complete a substantive review of the regulatory package, based on insufficient evidence of overall effectiveness for the proposed indication, and that additional well-controlled clinical trials are needed prior to the resubmission of the NDA for ALKS 5461."

29.     On this news, shares in Alkermes' stock fell $12.73 per share or nearly 22% to close at $43.23 per share on April 2, 2018.

30.     On October 30, 2018, the FDA released a briefing document concerning Alkermes' NDA for ALKS 5461. The briefing document stated the FDA did not agree with Alkermes' methodologies and that Alkermes disregarded the FDA's advice, stating in relevant part:

> The Montgomery Asberg Depression Rating Scale is a 10-item diagnostic questionnaire used to measure the severity of depressive episodes in patients with mood disorders (MADRS-10). The Applicant used an abridged 6-item version of the MADRS-10 for the primary endpoint of one of the principal studies (Study 207). *The Division had rendered advice explicitly against this plan, based on analyses of the MADRS-10 and MADRS-6 by both the Division and the agency's Clinical Outcomes Assessment (COA) Staff. The COA Staff had concluded that the MADRS-6 could not replace the MADRS-10 for use as a*

*primary endpoint because the abridged questionnaire excludes concepts that are relevant and important in MDD, specifically "reduced sleep," "reduced appetite," "concentration difficulties," and "suicidal thoughts."*

*       *       *

On September 26, 2016, the Applicant met with the Agency to share preliminary results from Studies 205 and 206. The Applicant acknowledged that neither study met its prespecified primary endpoint and inquired about any additional analyses that could be conducted. The Agency had no recommendations, but acknowledged that the additional analyses the Applicant already conducted could be informative for subsequent studies. For instance, the unadjusted pvalue < 0.05 for the 2/2 dose based on exploratory analyses in Study 205 along with the numerical superiority of 2/2 vs. placebo suggested that this dose was more likely to be effective than the 0.5/0.5 dose.

The Applicant submitted an amendment to the SAP and protocol for Study 207 on September 19, 2016. The cover letter for this submission referenced the then-upcoming September 26 meeting; however, the revised SAP could not be adequately reviewed within that 7-day time frame and was not discussed during that meeting. The amendment to the analytical plan changed the primary efficacy endpoint from change from baseline to end-of-treatment on the MADRS-10 to three primary endpoints to be evaluated in a hierarchical fashion:

- Change in MADRS-6 using average of changes from baseline to Week 3 through the end of efficacy period (Week 5 for Stage 1; Week 6 for Stage 2)
- Change in MADRS-10 score using average of changes from baseline to Week 3 through the end of efficacy period (Week 5 for Stage 1; Week 6 for Stage 2)
- Change in MADRS-10 score from baseline to end of treatment (Week 5 for Stage 1; Week 6 for Stage 2)

*These changes were ultimately discussed during a February 13, 2017, guidance meeting. In advance of the meeting, the Agency provided the following comments relative to the efficacy analyses:*

*1. In general, we do not accept major changes, such as revising the primary efficacy measures, in the late stage of a clinical trial. It appears that the primary endpoint and duration of the efficacy period for Stage 2 were changed very late in the course of the study.*

*2. We have not previously accepted the MADRS-6 as a primary efficacy endpoint for a clinical trial. Before accepting this instrument as primary endpoint in a trial intended to support product registration, we would need data on the validity and reliability of the instrument, and clear documentation of how the biometric properties of the MADRS-6 compare to*

11

*the MADRS-10. On face, we have concerns that the MADRS-6 omits diagnostically and clinically important aspects of depression.*

*3. We do not agree with the strategy of comparing the baseline MADRS-6 or MADRS-10 scores to the average of the scores from Week 3 to the end of the efficacy period. We note that the averaging of the change in MADRS-6 or MADRS-10 scores tends to obscure a possible dropoff in drug efficacy after the first few weeks of treatment. In Study 205, the change in MADRS-10 scores reached a peak at Week 3. In Study 207, the change in MADRS-6 and MADRS-10 scores both reached a peak at Week 4. It is important for us to know whether the drug has an effect that persists until the end of the study. We recommend using a single efficacy measure at the end of the study, and not an average over multiple time periods, as the primary efficacy endpoint.*

*4. With the protocol amendment for Study 207, the efficacy period in Stage 1 is now different in duration from the efficacy period in Stage 2. This adds some complexity to the comparison of data from the two SPCD stages. Please provide a rationale for the difference in duration of the efficacy periods.*

*During the meeting, the Applicant presented a slide showing continued improvement in mean change in MADRS-6 and MADRS-10 scores in the ALKS 5461 2/2 group when this group was followed from Week 0 in Stage 1 to Week 11 in Stage 2. We noted that, although the SPCD study design limits the conclusions that can be drawn with respect to drug efficacy when treatment response is compared across stages, the analysis did help to reduce the Division's concern about a possible loss of drug efficacy after Week 4. We also recommended that the Applicant submit a dossier for the MADRS-6, including reliability, validity, scoring instructions, rationale for item selection, and justification for its use in antidepressant efficacy trials.*

*The Applicant also proposed pooling Studies 205 and 207; the Agency stated that such pooled analyses could only be considered exploratory.*

The Applicant submitted a request for preliminary Breakthrough Therapy Designation Request advice on March 3, 2017. The Division informed the Applicant that, because we had not yet determined whether the MADRS-6 was an acceptable endpoint, and because any statistical significance in the phase 3 study results depended on *post hoc* analyses, it would be difficult for us to grant Breakthrough Therapy Designation.

On April 24, 2017, the Applicant submitted the dossier on the MADRS-6. The Division consulted the Agency's Clinical Outcomes Assessment (COA) Staff to evaluate the submission. Consistent with the Division's original thinking, the COA Staff concluded that the MADRS-6 could not replace the MADRS-10 for

12

use as a primary endpoint because it excludes concepts that are relevant and important in MDD. The MADRS-6 excludes "Reduced Sleep," "Reduced Appetite," "Concentration Difficulties," and "Suicidal Thoughts." Furthermore, results of a factor analysis on MADRS-10 suggested that the four items removed were highly associated, but not redundant with, the six items retained.

***The Agency provided the Applicant with the analyses of the COA Staff and their conclusions during a July 24, 2017, pre-NDA meeting. The Division informed the Applicant that any analyses of MADRS-6 scores would be considered exploratory.***

***The final portion of the NDA was submitted January 31, 2018. The Agency initially refused to file the application; however, after the Applicant clarified the analyses intended to support their efficacy claim, we agreed to review the application.***

(Emphasis added.)

31.     On this news, shares in Alkermes' stock fell $0.57 per share or over 1.4% to close at $39.80 per share on October 30, 2018.

32.     Then, on November 1, 2018, Alkermes announced that the FDA advisory committee voted 21 to 2 against the approval of ALKS 5461. That same day, *Xconomy* reported that, "[a]t the hearing, FDA representatives said the agency specifically told Alkermes not to analyze its data through an average, which it still did."

33.     On this news, shares in Alkermes' stock fell $3.09 per share or over 7.5% to close at $37.74 per share on November 2, 2018, damaging investors.

34.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

35.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

otherwise acquired the publicly traded securities of Alkermes during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

36. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

37. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

38. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

39. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

40.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

41.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's securities are traded in efficient markets;

(d)     the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)     the Company traded on the NASDAQ, and was covered by multiple analysts;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)     Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

42.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

43.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

16

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

44.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

45.     This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

46.     During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

47.     The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

48.     The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or

acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

49.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

50.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

51.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the

Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

52.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

53.     By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

**COUNT II**

**Violation of Section 20(a) of The Exchange Act**
**Against The Individual Defendants**

54.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

55.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

56.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

57.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class

19

Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

58.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

59.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: December 27, 2018                Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/Phillip Kim
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 34th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

*Counsel for Plaintiff*